[Civ. No. 29818.   Second Dist., Div. Four.   Feb. 2, 1967.]

JOYCE M. RUSSELL, Plaintiff and Appellant, v. RALEIGH IRWIN LESCALET et al., Defendants and Respondents.

Guerin & Guerin and John Guerin for Plaintiff and Appellant.

J. Roger Gelsinger, John R. Engman, Everett H. Aspenson, Thomas L. Jensen, Jr., and Ernest J. Gekas for Defendants and Respondents.

BISHOP, J. pro tem.*—The plaintiff has appealed from the judgment, which doubly aggrieves her. First, it adjudges that she take nothing by reason of the action which she brought to have a piece of real property, 50' x 120' in size, and which we shall refer to as Lot 223, partitioned by selling, paying off some encumbrances on it, and dividing the balance between her and defendant Raleigh Lescalet. Second, it decrees: (1) that she has "no estate, right, title, lien or interest whatsoever" in Lot 223, but (2) that at the beginning of the action October 10, 1963, the title to the lot was vested in the two defendants Lescalets, who had filed a cross-complaint to quiet

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

title. We find ourselves unable to affirm the judgment, and are reversing it.

It would be well to have before us a chronology of pertinent events. June 1, 1953, there was entered in the minutes of the Los Angeles Municipal Court a judgment for $191.23 against cross-complainant Gertrude Lescalet. An abstract of this judgment was filed in the County Recorder's office June 9, 1953.

November 25, 1953, by a grant deed from Western Projects Corporation, Lot 223 was conveyed to "Raleigh Irwin Lescalet and Gertrude Lescalet, husband and wife as joint tenants." This deed was recorded two days later.

Under date of October 20, 1954, the Sheriff of Los Angeles County, levied a writ of execution on Lot 223 and sold the "right, title and interest of Gertrude Lescalet on December 28, 1954." A sheriff's deed (misreciting some of the earlier dates) was given, conveying to Al and M. C. Fletcher all the interest that Gertrude Lescalet had in Lot 223 on October 20, 1954. This deed was dated February 11, 1957.

Lot 223 was then the subject of successive quitclaim deeds from the Fletchers on to the plaintiff. The last was dated June 11, 1963. On October 10 of that year the complaint in this action was filed.

In its findings of fact the trial court recognized the acquisition of title by the two Lescalets, as joint tenants, on November 20, 1953. Its next finding was that the two Fletchers acquired all of Gertrude Lescalet's "then interest" in Lot 223 under the sheriff's deed, February 11, 1957. The consequence of this change of owners was to put an end to the joint tenancy and to substitute, as the owner of Lot 223, the Fletchers and Raleigh Lescalet, as tenants in common. We make this statement because, "It is well settled in this and other states that, while all joint tenants are alive, execution may be had upon the interest of one of the joint tenants, and that upon the purchase of the interest of that joint tenant at execution sale the joint tenancy is severed and the purchaser and the other joint tenant or tenants become tenants in common." (*Zeigler* v. *Bonnell* (1942) 52 Cal.App.2d 217, 219 [126 P.2d 118, 119].)

See also *Hammond* v. *McArthur* (1947) 30 Cal.2d 512, 514-515 [183 P.2d 1, 2-3.] From February 11, 1957 on, therefore, Lot 223 was owned by tenants in common. One of these was Raleigh Irwin Lescalet; the others, at first the two Fletchers, subsequently, the several who followed in succession as the

grantees under the quitclaim deeds, the succession ending with the plaintiff, who took title to what had been Gertrude's interest.

■ At all times from November 1953 to and beyond October 10, 1963, the two bedroom house on Lot 223 was occupied by tenant Raleigh Irwin Lescalet and his family; not one of his cotenants ever had possession of it. It was he who paid the taxes on it. Was his possession "adverse" to the interests of the Fletchers and their successors? To this crucial question the answer is, "It was not." In *Dimmick* v. *Dimmick* (1962) 58 Cal.2d 417, 422 [24 Cal.Rptr. 856, 858-859, 374 P.2d 824], we find these quotations from earlier Supreme Court cases: "As plaintiff and defendant were cotenants holding the land in joint ownership, the principle stated in *Johns* v. *Scobie,* 12 Cal.2d 618, 623 [5] [86 P.2d 820, 121 A.L.R. 1404], is applicable: 'It is a fundamental rule that each tenant in common has a right to occupy the whole of the property. The possession of one is deemed the possession of all; each may assume that another in exclusive possession is possessing for all and not adversely to the others; and consequently one tenant in common does not, merely by exclusive possession, gain title by adverse possession against the others. Such possession will be presumed to be by permission and rightful, unless notice is brought home to the others that it has become hostile.'

"*West* v. *Evans, supra,* 29 Cal.2d 414, 418 [5] [175 P.2d 219], states the rule thus: 'The exclusive occupancy by a cotenant is deemed permissive; it does not become adverse until the tenant out of possession has had either actual or constructive notice that the possession of the cotenant is hostile to him.' "

Also we find it stated in *Weller* v. *Chavarria* (1965) 233 Cal.App.2d 234, 242-243 [43 Cal.Rptr. 364, 370-371] : "Where, as here, a claim of ownership by adverse possession is asserted against a cotenant additional principles become operative. It is settled law that the exclusive occupancy of jointly owned premises by a cotenant is deemed permissive and does not become adverse until the tenant *out of possession* has had either actual or constructive notice that the possession of the cotenant is hostile to him. [Citing many cases, including *Wilkerson* v. *Thomas* (1953) 121 Cal.App.2d 479 [263 P.2d 678], and *Faubel* v. *McFarland* (1904) 144 Cal. 717, 720 [78 P. 261].]

"As the court said in *Wilkerson, supra* : 'A cotenant out of

possession is entitled to assume that the permissive possession of his cotenant continues to be amicable until he is charged with some form of notice that such possession has become hostile. [Citations.] Before title may be acquired by adverse possession as between cotenants, the occupying tenant must bring home or impart notice to the tenant out of possession, by acts of ownership of the most open, notorious and unequivocal character, that he intends to oust the latter of his interest in the common property. [Citations.] Such evidence must be stronger than that which would be required to establish a title by adverse possession in a stranger. [Citations.]' (P. 488.) In short, one tenant in common cannot by mere exclusive possession acquire the title of his cotenant. (*Faubel* v. *McFarland, supra.*)''

■ There was no evidence of any hostile disposition on the part of tenant Raleigh Lescalet toward his out of possession cotenant that warranted the finding No. 13 that he had ''acquired title thereto by adverse possession being sufficient against plaintiff and all others.''

Nor is there any evidence that the presence of Gertrude Lescalet on the premises gave her title by adverse possession. Starting with the premise we find to be thoroughly established, that the possession by Raleigh Lescalet was authorized by his title as a cotenant, we entertain no doubt that such possession could be lawfully extended to his wife and her children. Their possession was not an independent possession; it was embraced in his.

The judgment depends upon the conclusion that cross-complainants acquired a title, as joint tenants, by adverse possession. Because we find this to be an unsupported conclusion—whether of fact or law—the judgment is reversed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

A petition for a rehearing was denied February 27, 1967.